IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DANIEL E. T.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 18-cv-2183-DGW[2] |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for SSI in June 2015, alleging a disability onset date of October 1, 2014. After holding an evidentiary hearing, an ALJ issued a partially favorable decision on February 28, 2018. (Tr. 16-29). The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

**Issues Raised by Plaintiff**

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 10, 15.

1

Plaintiff raises the following issues:

1. The ALJ erred in weighing the medical opinions.

2. The ALJ failed to consider plaintiff's use of a cane and obesity.

3. The ALJ's analysis of plaintiff's subjective complaints was erroneous.

## **Applicable Legal Standards**

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921

3

(7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of lumbar spondylosis, chronic moderate lung obstruction, hypertension, obesity, and chronic deformity of T12, which did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to do work at the light exertional level, with nonexertional physical limitations consisting of (1) occasional climbing of ladders, ropes, scaffolding, ramps, and stairs; (2) occasional stooping, kneeling, crouching, and crawling; and (3) no concentrated exposure to pulmonary irritants.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work. However, he was not disabled through September 2, 2017, because he was able to do other jobs that exist in significant numbers in the national economy. Plaintiff turned 55 on September 3, 2017 and was deemed disabled as of that date under the Medical-Vocational Guidelines ("Grids") 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 2.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff said he was disabled because of back problems and lung issues. He was 5' 9" tall and weighed 205 pounds. He said he stopped working on March 6, 2015, because he was slowing down due to back pain and his employer said he was too slow for the job. He had past employment as a factory laborer, an agricultural laborer, a millworker, and a roadworker. (Tr. 208-209).

In a function report submitted in August 2015, plaintiff said that he lived alone in a mobile home. He could not walk very far or sit or stand for very long. On a typical day, he rode a four-wheeler to check on his garden, got the mail, worked on his chainsaw or his kids' weed eaters, and did wood working. When his back went out he could not walk at all. He cooked his own meals, cleaned house, mowed the grass, and gardened. These chores took longer than they used to. Activities such as standing, reaching, walking, sitting, and climbing stairs hurt his back. He used a cane "once in a while." It was not prescribed by a doctor. (Tr. 229-236).

A work history report showed that he had worked in a factory from March through September 2014. He returned to that factory from January through March 2015. (Tr. 241).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in October 2017. (Tr. 36).

Plaintiff worked as a packer in a factory for a couple of months in early 2015. His back went out and he got laid off because he was too slow. (Tr. 44).

Plaintiff testified that he had back pain all day and he spent at least half the

day laying down in a recliner to relieve pain and fatigue. (Tr. 46). He did some work on his mower and four-wheeler, but it took him longer to get projects done because he had to take frequent breaks to relieve pain. (Tr. 47-48). He tinkered on his lawnmowers and four-wheeler in a shed on his property. He rode his four-wheeler from his house to the shed. (Tr. 59).

Plaintiff had a cane at the hearing. He said he used it every day whenever he had to walk any distance. It was not prescribed by a doctor. (Tr. 58).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question which corresponded to the written RFC assessment. The VE testified that this person could not do plaintiff's past work, but he could do other jobs such as cashier II, deli clerk, and cleaner/housekeeper. If he were to be off-task for 20% of the workday or absent from work more than one day a month, he would be unemployable. (Tr. 68-69).

### 3. Relevant Medical Records

Plaintiff was treated by a chiropractor for low back pain in March 2015. He was treated with adjustment, electric muscle stimulation, and moist heat. He was to return as needed. (Tr. 327-328).

The next medical record is a report of a consultative exam by Dr. Adrian Feinerman in September 2015. Plaintiff complained of low back pain since age 17 due to degenerative disc disease without surgery. On exam, he was 5' 8" and weighed 213 pounds. Physical exam was normal. He had a full range of motion of the back. Straight leg raising was negative. Ambulation was normal. Muscle strength was normal. There were no muscle spasms or atrophy. (Tr. 333-342).

Plaintiff was seen by AP Angela Casolari at CCH Medical Clinic on November 30, 2015, for lumbar pain with bilateral radiculopathy. He said it had been hurting on and off for one to two years. On exam, he walked with a cane and had tenderness in the lumbar area. He had pain with movement of the lumbar spine. Straight leg raising was positive for back pain. Sensory exam was normal. (Tr. 488-490).

An MRI of the lumbar spine showed moderate lumbar spondylosis with facet arthropathy. Epidural lipomatosis was present as well as multilevel spinal canal stenosis most significant at L4-5.[4] There was a small central to left protrusion at L5-S1, mild multilevel foraminal narrowing, and a chronic T12 compression fracture. (Tr. 346, 348).

APN Casolari saw plaintiff to review the MRI results in December 2015. She diagnosed spinal stenosis of the lumbar region and referred him to physical therapy and an orthopedic specialist. He was to take ibuprofen for pain and inflammation and to avoid lifting or twisting until his symptoms were relieved. (Tr. 492).

Plaintiff was evaluated for physical therapy in December 2015 and was scheduled for three sessions of therapy a week for six weeks. After four sessions, he "requested to do therapy on his own." (Tr. 500-511).

Plaintiff saw APN Casolari in February 2016 for left knee pain caused by a fall on the snow. The diagnosis was sprain of the knee. (Tr. 512-514). He was seen again in March 2016 for routine follow-up. He was wearing a brace on his left

---

[4] "Epidural lipomatosis is a rare disorder in which an abnormal amount of fat is deposited on or outside the lining of the spine." https://www.cedars-sinai.edu/Patients/Health-Conditions/Epidural-Lipomatosis.aspx, visited on July 12, 2019.

knee. He walked with a limp but did not use a cane. He had mild pain in the lumbar area with motion. He was prescribed Tramadol and Mobic for knee pain. (Tr. 516-519).

Dr. Victoria Johnson evaluated plaintiff on APN Casolari's referral in June 2016. She reviewed his December 2015 MRI. On exam, he had no tenderness on palpation of the lumbar area. Forward flexion and lateral bending were moderately restricted, and extension was mildly restricted. Straight leg raise and Patrick's maneuver produced diffuse pain bilaterally. The impression was lumbar spondylosis, fairly mild, and epidural lipomatosis causing spinal stenosis. Dr. Johnson recommended weight loss. If he wanted to try an epidural steroid injection, she recommended it be done at the L4-5 level on the right. She advised that injections are sometimes helpful with stenosis caused by epidural lipomatosis and sometimes not. (Tr. 477-479).

APN Casolari referred plaintiff to pain management for epidural steroidal injections. (Tr. 521).

Dr. Shane Fancher, a pain management specialist, administered an injection at L4-5 on July 29, 2016. Dr. Fancher administered more injections in September, October, and November 2016. (Tr. 380-386). In October, plaintiff told APN Casolari that the injections gave him only two to three weeks of relief. On exam that day, he had mild pain with range of motion of the thoracic and lumbar spine. Sensory exam was normal. (Tr. 541-543). Dr. Fancher administered diagnostic medial branch blocks in December 2016. He noted that plaintiff's MRI showed a combination of displaced disc disease, with facet arthropathy and

spondylosis, and he was not a candidate for a spinal cord stimulator or other several other treatments "due to his insurance status." He recommended that plaintiff seek a second opinion regarding possible fusion surgery. (Tr. 379).

A lumber MRI done in January 2017 showed no significant change as compared to the prior MRI from December 2015. (Tr. 402-403).

Plaintiff saw Dr. Mohammed Rahman, a neurosurgeon, in late January 2017. Dr. Rahman recommended a decompressive lumbar laminectomy at L3 through S1. The surgery was done on March 15, 2017. At the two-week follow-up visit, he had only mild pain in the low back when he was up and moving around, with no pain in the lower extremities. One month after surgery, he pain in the mid back radiating to the hips when walking. He was taking Tramadol and ibuprofen for pain. On exam, he had no gross motor deficits in the lower extremities. Hip flexion, knee extension, dorsiflexion, plantar flexion, and extensor hallucis longus were full bilaterally. Sensation in the lower extremities was intact to touch. He was advised to increase activities as tolerated, and to start outpatient physical therapy, but he "did not wish to proceed" with therapy. He agreed to do a home exercise program. (Tr. 387-393).

About ten days before the last visit with Dr. Rahman's office, APN Casolari observed that plaintiff was still using a cane, but he said he was able to walk better without as much pain. He had occasional hip pain, but no radiculopathy. She directed him to follow-up with the surgeon and to use a cane for ambulation as needed. (Tr. 554).

Plaintiff started physical therapy for his back in early May 2017. At the

9

initial evaluation, his gait was antalgic, and he used a cane. The plan was for therapy three times a week for four weeks. (Tr. 440-442).

In June 2017, plaintiff was seen by Dr. Jerabek, who practiced in the same office as APN Casolari. He said that he had been released from weight restrictions and had lifted a sixty-pound engine off a lawnmower, which caused pain in his back. His gait was normal. There is no mention of a cane. He had tenderness in the lumbar spine and moderate pain with range of motion. Dr. Jerabek ordered x-rays. He was seen by APN Casolari two weeks later. The x-rays showed no acute findings. He was waiting for approval from Medicaid for physical therapy. He was using a cane. He resumed physical therapy a few days later. In July 2017, he said that he had reinjured his back a few days ago. He reported "non-compliance with HEP [home exercise program] secondary to spending his time working on lawn mowers and 4-wheelers, which seldomely [sic] increases his back pain." He was using a cane. The therapist noted that he had shown minimal improvement with physical therapy. He was discontinued and referred back to his doctor because of increased back pain. (Tr. 562-582).

About two weeks later, plaintiff saw APN Casolari. He was using a cane and had moderate pain with motion of the lumbar spine. He also had left knee pain. (Tr. 583-587).

4. **APN Casolari's Opinion**

APN Casolari completed a form entitled Residual Functional Capacity Report on January 2, 2017. This form asked her to assume that plaintiff was capable of doing no more than light exertional work. She was not asked to assess his RFC on

10

a function-by-function basis, except for environmental restrictions. She indicated that plaintiff would be required to take unscheduled breaks because of pain more than four times per month and he would be likely to miss work about once a month. She noted that she had referred him to pain management and to a spine specialist. (Tr. 481-483).

   5.   **State Agency Consultant's Opinion**

Acting as a state agency consultant, Dr. Dow assessed plaintiff's RFC based on a review of the record in March 2016. The materials reviewed included Dr. Feinerman's report and the December 2015 MRI. She concluded that plaintiff could do light work with the same postural and environmental limitations adopted by the ALJ in his RFC assessment. (Tr. 100-103).

## Analysis

The Court first notes that plaintiff's brief asserts that plaintiff alleged that he became disabled as of March 6, 2015, but the agency "recorded his onset date as October 1, 2014." Doc. 16, p. 1. However, plaintiff's application alleges disability as of October 1, 2014 and the employee who conducted the initial interview wrote that plaintiff "insisted he did not become disabled until 10/01/2014." (Tr. 181, 205). The ALJ referred to the alleged onset date of October 1, 2014, at the hearing, and plaintiff's counsel did not raise an issue as to the date. (Tr. 42-43).

Plaintiff first argues that the ALJ erred by giving too much weight to Dr. Dow's opinion and too little to APN Casolari's.

The Commissioner mischaracterizes Dr. Dow's opinion. He asserts that Dr. Dow found plaintiff was capable of light work "if limited to sitting six hours per

11

day." Doc. 20, p. 11. In fact, Dr. Dow opined that plaintiff was capable of standing and/or walking for six hours a day as well as sitting for six hours. Tr. 101.

The ALJ was required to weigh Dr. Dow's opinion by considering the factors listed in 20 C.F.R. § 404.1527(c). According to plaintiff, simply applying factor (c)(3) "decisively demonstrates the ALJ's error." Doc. 16, p. 13. Factor (c)(3) is supportability. Plaintiff argues that Dr. Dow's opinion should not have been credited because she reviewed only a minute fraction of the medical evidence, i.e., Dr. Feinerman's report and the initial physical therapy evaluation from December 2015.

Plaintiff's argument here is factually incorrect. Dr. Dow reviewed other records in addition to the ones cited by plaintiff. Plaintiff describes the MRI reports as "critical evidence." Doc. 16, p. 14. Dr. Dow discussed the results of the first MRI at Tr. 101.

Citing *Stage v. Colvin*, 812 F.3d 1121 (7th Cir. 2016), plaintiff also argues that it was error to accept Dr. Dow's opinion because it was outdated. In *Stage*, the Seventh Circuit held that the ALJ erred in accepting a reviewing doctor's opinion where the reviewer did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion." *Stage*, 812 F.3d at 1125. In a later case, the Seventh Circuit reiterated the rule. "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v.*

12

*Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018). See also, *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018).

Dr. Dow reviewed the record early on, in February 2016. She reviewed the December 2015 MRI, but not the pain specialist's records or the records of the neurosurgeon. The Commissioner describes Dr. Dow as a "general practice physician." Doc. 20, p. 13. There is no suggestion that she was qualified to determine whether plaintiff needed surgery based on her review of the MRI. At the time she reviewed the records, she could not have known that physical therapy and pain management would be unsuccessful and that a neurosurgeon would ultimately perform surgery. In these circumstances, it was error to give great weight to Dr. Dow's outdated opinion.

Plaintiff is also correct about APN Casolari's opinion.

APN Casolari is not considered an "acceptable medical source" for purposes of this case. 20 C.F.R. § 404.1502(a).[5] Her report does not constitute a "medical opinion." See, 20 C.F.R. §404.1527(a)(1) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources. . . .") It follows that her report is not entitled to any special weight under §404.1527(c), the so-called "treating source rule". SSR 06-03p, 2006 WL 2329939, at *2. This does not mean, however, that the ALJ was allowed to simply write off her opinion.

The ALJ is required to consider "all relevant evidence" and may, as appropriate, consider the factors set forth in § 404.1527(c) in the process of weighing the opinions of nonacceptable medical sources. SSR 06-3p, at * 4-5; §

---

[5] An APN is considered an acceptable medical source for claims filed on or after March 27, 2017. § 404.1502(a)(7).

404.1527(f).

The ALJ considered APN Casolari's opinion at Tr. 25. He said that he gave her opinion "less weight" that that of Dr. Dow because "her opinion is less consistent with the overall record, and she is not an acceptable medical source, as the [state agency] consultants are." He did not explain how her opinion was less consistent with the overall record. In the next paragraph, he said he gave "no weight to any restrictions surrounding the time of the claimant's surgery, given their temporary nature." (Tr. 25). It is unclear whether that statement refers to APN Casolari's opinion, given in February 2017, or to restrictions imposed by the surgeon.

APN Casolari is the health care provider who saw plaintiff over the longest period and most frequently. Much of the ALJ's discussion of the medical treatment consists of references to visits with her. It was APN Casolari who ordered the first MRI and who managed plaintiff's care, referring him for physical therapy and pain management. The ALJ's brief discussion gives no indication that he considered the central role played by APN Casolari, or the other factors set forth in § 404.1527(c). While her opinion might not be entitled to "controlling weight" as a treating source, the ALJ was required to consider the regulatory factors in weighing her opinion.

In his brief, the Commissioner argues that the ALJ reasonably discounted APN Casolari's opinion because it was given two months before surgery and plaintiff improved following surgery. Doc. 20, pp. 13-14. However, it is unclear whether the ALJ's statement about temporary restrictions was meant to apply to APN

14

Casolari's opinion. Even if it did, the period in issue is from October 1, 2014, through September 2, 2017. The surgery was not until March 15, 2017, so that rationale does not apply to most of the period during which APN Casolari treated plaintiff.

As to consistency with the record, the Commissioner offers a detailed analysis of how APN Casolari's opinion was inconsistent with the medical evidence. Doc. 20, pp. 12-13. However, this is the after-the-fact reasoning of the Commissioner (or his lawyers) and not the reasoning of the ALJ. The ALJ's decision cannot be upheld based upon the Commissioner's after-the-fact rationalization. *Hughes v. Astrue*, 705 F.3d 276, 279(7th Cir. 2013) ("Characteristically, and sanctionably, the government's brief violates the *Chenery* doctrine….."); *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision…."). The Commissioner points out that the form provided to APN Casolari instructed her to assume that plaintiff was capable of light work, but that fact was not mentioned by the ALJ. He also argues that the ALJ "reasonably considered that as a nurse, NP Casolari's specialization was less relevant than that of Dr. Dow, a general practice physician." Doc. 20, p. 13. That is not what the ALJ said. The ALJ did not refer to the relevance of her specialization; rather, he said that her opinion was entitled to less weight than that of the consultants because she was not an acceptable medical source. (Tr. 25).

Because of the ALJ's errors, this case must be remanded. It is unnecessary to consider the rest of plaintiff's arguments. The Court wishes to stress that this

Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATE: July 24, 2019.

*Donald G. Wilkerson*

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**